Filed 6/18/24  In re Mic.L. CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re Mic.L. et al., Persons Coming Under the Juvenile Court Law. | B333195 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. C.A. et al., Defendants and Appellants. | Los Angeles County Super. Ct. Nos. 18CCJP07663A, 18CCJP07663B |

APPEAL from orders of the Superior Court of Los Angeles County, Gabriela H. Shapiro, Juvenile Court Referee.  Affirmed.

Gina Zaragoza, under appointment by the Court of Appeal, for Defendant and Appellant C.A.

Caitlin Christian, under appointment by the Court of Appeal, for Defendant and Appellant M.L.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, Kelley G. Emling, Deputy County Counsel, for Plaintiff and Respondent.

---

Mother C.A. and father M.L. appeal from the juvenile court's orders terminating parental rights to their twin daughters, Mia.L. and Mic.L. Mother contends the juvenile court erred by declining to apply the parental-benefit exception to adoption. Father joins mother's argument. We find no error and affirm.

### FACTUAL AND PROCEDURAL BACKGROUND[1]

**1.** ***The investigation and petition***

Mother and father have twin girls together—Mia.L. and Mic.L.—who were born in October 2018. Mother has three children from other relationships: A.A. (born in 2012), L.C. (born in 2015), and C.C. (born in 2016). L.C. and C.C. share the same father and are Indian children. This appeal concerns only the twins, Mia.L. and Mic.L.

In 2017, a dependency court sustained a Welfare and Institutions Code section 300[2] petition and removed A.A., L.C., and C.C. from mother's custody. The court found mother abused methamphetamine, which rendered her incapable of providing regular care for the children. Mother had yet to reunite with the children by the time she gave birth to the twins.

---

[1] Although both mother and father appealed, their arguments on appeal concern only mother's relationship with the children. Therefore, we focus on the facts related to mother and do not summarize the facts related to father.

[2] Undesignated statutory references are to the Welfare and Institutions Code.

Mother told the Los Angeles County Department of Children and Family Services (the Department) she used methamphetamine daily from the age of 13 until she became pregnant with her first child, A.A. According to mother, she stopped using the drug, but she relapsed in 2016. When she found out she was pregnant with the twins, she entered a treatment program and stopped using drugs.

On November 30, 2018, the Department filed a petition asserting Mia.L. and Mic.L. are persons described by section 300. The petition alleged mother has a history of illicit drug use, including amphetamines and methamphetamine, which renders her unable to provide regular care and supervision for the children.

At a detention hearing on December 3, 2018, the court found a prima facie case showing the children are persons described by section 300. Nevertheless, the court ordered the children released to mother.

## 2. *The children are placed with relative caregivers*

Mother's treatment center terminated her from the program sometime after the detention hearing. According to mother's counselor, this was the third time mother had been terminated from the program, and she would not be allowed to return.

The Department also learned mother had been involved in two recent incidents involving the police. The first incident occurred eight days after mother gave birth to the twins. According to the police report, mother drove away when officers tried to pull her over. When mother eventually stopped, two men got out of her car and ran in opposite directions. Mother told the officers she had just met the men at a liquor store and they

had invited her to a party. Mother was charged with felony evading a police officer and misdemeanor driving without a license.

During the second incident, mother was driving her friend while the twins were in the car. The police surrounded the car and arrested the friend. The Department learned the friend was a gang member, has a history of domestic violence, and had been charged with assault with a deadly weapon after beating someone with a baseball bat.

In light of these developments, the court removed the children from mother's custody on February 22, 2019. The Department placed the children with a maternal aunt and her husband, whom we refer to as the relative caregivers.

3. ***The court takes jurisdiction over the children and returns them to mother***

The court held a combined jurisdiction and disposition hearing on May 28, 2019. The court found true the allegations related to mother's substance abuse, declared the twins dependents of the court, and removed them from their parents' custody. The court ordered the parents to participate in counseling, parenting classes, and alcohol and drug programs. The court granted both parents monitored visitation.

The Department reported the children had bonded to the relative caregivers and were thriving in their placement. Mother visited the children regularly, and the Department eventually liberalized her visits to unmonitored. According to the Department, mother was affectionate, nurturing, and attentive during visits. Mother engaged with the children, fed them, talked to them, and changed their diapers.

4

The court ordered the twins be returned to mother's custody on September 24, 2020.  As of March 2021, the Department reported the children were doing well in mother's care.  Mother was participating in services and consistently tested negative for drugs and alcohol, although she was occasionally a "no show."

4.      *The Department places the children with foster parents*

On April 29, 2021, the Department removed the children from mother's custody after discovering six of her negative drug tests had been diluted.  Mother admitted occasionally drinking alcohol, including while the children were at home.  She also admitted leaving the children in the care of her friend, whose home the Department had not cleared.  Mother had never visited the home before allowing the children to stay there.

The Department explored placing the children with the relative caregivers who had previously cared for them.  However, the caregivers had recently started caring for two of mother's other children—L.C. and C.C.—and their house was not large enough to accommodate more children.  Therefore, the Department placed the children with foster parents.

The Department reported the foster parents were meeting the children's needs on a consistent basis.  The children were well-adjusted and "thriving" in their placement.  However, both children started to display aggressive behavior that required intervention.

Mic.L. also experienced severe health issues while living with the foster parents.  The child underwent brain and heart surgery, suffered frequent severe nosebleeds, and broke out in hives for unknown reasons.  A specialist prescribed Mic.L.

an EpiPen to prevent anaphylaxis, and an ophthalmologist directed her to wear glasses at all times.

Mother consistently visited the children while they were in foster care. The visits reportedly went well, and the children were happy to see mother. Mother was nurturing, provided appropriate snacks, and focused on the children. The Department eventually liberalized mother's visits to unmonitored.

Although mother generally acted appropriately during visits, the Department remained concerned about the children's safety while under her care. According to the caregiver, mother did not always have an EpiPen on hand, and she did not make Mic.L. wear her glasses at all times. During one visit, mother gave Mia.L. over-the-counter cough medicine, despite the child's doctor warning that such medications could have adverse side effects. At another visit, mother drove the children a significant distance without securing them in car seats.

**5.      *The court reverts mother's visits***

In November 2022, the Department discovered photographs of mother drinking alcohol, handling nitrous oxide, and allowing the children to visit father, in violation of a court order. The Department also discovered text messages in which mother coached father to lie to the Department about the visit. In other messages, mother warned maternal uncle not to tell anyone she had been drinking for fear it would get back to the Department.

Based on those photographs and messages, the Department filed a petition to revert mother's visits to monitored. The court considered the petition at a review hearing on February 8, 2023. Minors' counsel urged the court to grant the petition and terminate mother's reunification services. Counsel argued

6

the new evidence undermined everything mother had been telling the court about her progress.

The court granted the petition and reverted mother's visits to monitored. However, the court continued mother's reunification services, noting she had made some progress by participating in services.

The Department reported the children were happy and "thriving" in the foster parents' home. The foster parents met the children's needs and attended all their medical appointments. In contrast, mother did not show up to every appointment and had not attended an EpiPen training class. A social worker remarked that mother did not seem to realize the children's behavioral issues were the result of past trauma.

Mother continued to visit the children regularly. During one visit, mother became angry when Mia.L. referred to the foster parent as " '[m]ommy.' " Mother insisted the foster parent was not the child's mommy. Mia.L. became upset and responded, in a "firm voice, 'No. I have two [m]ommy's.' "

During another visit, Mic.L. became upset when mother would not let the child's older sister help her put on shoes. Mother responded by firmly holding Mic.L. in her arms while the child struggled to get free, called mother names, and hit mother. It took 45 minutes for Mic.L. finally to calm down. The social worker characterized the incident as a " 'power struggle' " over the child recognizing mother as an authority figure.

The foster parents reported that, as of May 2023, Mic.L. started to express not wanting to attend visits. Around the same time, she started throwing tantrums during visits, although she would eventually refocus and cooperate. According to a

social worker, Mia.L. would "become quiet" when asked about visits with mother, which was out of the norm for the child.

**6.    *The children return to the relative caregivers' home***

On July 12, 2023, the court found mother had made only partial progress toward alleviating the causes necessitating placement, and it terminated her reunification services.

About a month later, in August 2023, the Department placed the children back in the relative caregivers' home. The relative caregivers continued to care for the children's siblings —C.C. and L.C.—as well. Although the caregivers originally had not been able to care for all four children at the same time, they had recently purchased a larger home specifically for that purpose.

According to the relative caregivers, the children continued to exhibit aggressive behavior and struggled to control their anger while in their home. Among other things, they would hit one another, shout, and use obscene gestures. Both children were referred to behavioral therapists to address their issues.

Mother continued to visit the children, typically for six hours per week. The visits reportedly went well, and the children were happy to see mother. The caregiver said the children were ready to leave at the end of visits and did not struggle to say goodbye. The children rarely mentioned mother during the week. Occasionally, they would throw tantrums and say they missed her.

The children said visits with mother were both good and bad. They enjoyed spending time with mother, eating with her, and hugging her. However, the visits could be bad because they would play rough and mother would get mad at them for misbehaving.

Mother said she was "100% bonded" with the children. However, a social worker observed the children were not very bonded with mother, noting they seemed to view her as a " 'weekend mother.' "

The Department reported that mother did not consistently and timely respond when the children became aggressive with each other. Instead, mother waited to intervene until the situation escalated. The caregiver remarked that mother did not set rules during visits. As a result, after visits, the children would struggle to adjust to their routine at home and had difficulty keeping their hands to themselves.

### 7.    *The court terminates parental rights*

The court held a section 366.26 permanency planning hearing on November 8, 2023. The Department recommended terminating parental rights and pursing adoption with the relative caregivers.

Mother urged the court instead to apply the parental-benefit exception to adoption. According to mother, the exception applied because she had maintained regular visitation and contact with the children, the children would benefit from continuing their relationship with her, and termination of that relationship would be detrimental to them.

Minors' counsel joined mother in arguing for the parental-benefit exception to adoption. Counsel said she was torn on the issue, because adoption would seem to be the best plan for the children. However, the twins' siblings—L.C. and C.C.—are Indian children, and their tribe objected to adoption. Counsel said she was concerned that, at some point in the future, mother might file a section 388 petition seeking to reunite with L.C. and C.C. If so, Mia.L. and Mic.L. might be confused as to why

9

they do not have a similar opportunity to reunite with mother. Under these unique circumstances, counsel argued, the benefits of adoption are marginally outweighed by the harm of losing a connection to mother.

The court terminated parental rights, finding mother had not shown the parental-benefit exception to adoption. The court noted the children had spent most of their lives outside mother's custody, and they had never articulated a strong desire for mother to remain in their lives. The court rejected as speculative minors' counsel's argument concerning the possibility that mother would seek to regain custody of the children's siblings.

Mother and father timely appealed.

## DISCUSSION

Mother's sole contention on appeal is the juvenile court erred by failing to apply the parental-benefit exception to adoption at the section 366.26 hearing. Father joins mother's argument. He does not raise any independent grounds for relief.

"The sole purpose of the section 366.26 hearing is to select and implement a permanent plan for the child after reunification efforts have failed." (*In re J.D.* (2021) 70 Cal.App.5th 833, 851–852 (*J.D.*); *In re Marilyn H.* (1993) 5 Cal.4th 295, 304; see also § 366.26, subd. (b).) At that stage, the "focus shifts from monitoring the parents' progress toward reunification to determining the appropriate placement plan for the child." (*Marilyn H.*, at p. 305.) "The dependency statutes embody a presumptive rule that, after reunification efforts have failed, parental rights must be terminated in order to free a child for adoption." (*J.D.*, at p. 852, citing *In re Caden C.* (2021) 11 Cal.5th 614, 630–631 (*Caden C.*).) The juvenile court must

10

select adoption as the permanent plan and terminate parental rights unless it finds doing so would be detrimental to the child under one of several statutory exceptions. (§ 366.26, subd. (c)(1); *Caden C.*, at pp. 630–631.)

Section 366.26, subdivision (c)(1)(B)(i) codifies one of those exceptions to adoption, which is commonly referred to as the parental-benefit exception. (See *Caden C., supra*, 11 Cal.5th at p. 625, fn. 2.) The exception applies where "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i); *J.D., supra*, 70 Cal.App.5th at p. 852.) The exception has three elements, each of which the parent must prove by a preponderance of the evidence: (1) regular visitation and contact with the child, taking into account the extent of visitation permitted; (2) the child has a substantial, positive, emotional attachment to the parent; and (3) terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home. (*Caden C.,* at p. 636.)

In assessing whether termination of parental rights would be detrimental to the child, the juvenile court must perform a "case-specific inquiry," asking, "does the benefit of placement in a new, adoptive home outweigh 'the harm [the child] would experience from the loss of [a] significant, positive, emotional relationship with [the parent?]' [Citation.] When the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be 'detrimental to the child *due to*' the child's beneficial relationship with a parent." (*Caden C., supra*, 11 Cal.5th at pp. 633–634.) To decide the issue, courts may consider

11

"[t]he age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575–576 (*Autumn H.*).)

Here, the juvenile court found mother satisfied the first element of the parental-benefit exception by maintaining regular visitation with the children. As to the second element, the court found a substantial positive emotional attachment from mother to the children, but not from the children to mother. Nevertheless, the court explained that "for purposes of my ruling, I will find that prong 2 may exist in this case as well, though I do think the evidence is somewhat lacking in this regard."

Based on this comment, it appears the court declined to apply the parental-benefit exception based solely on mother's failure to satisfy the third element. That element required mother to show termination would be detrimental to the children even when balanced against the benefit of a new, adoptive home. (*Caden C., supra*, 11 Cal.5th at p. 636.) The court's decision on the issue is discretionary, and we review it for abuse of discretion. (*Id.* at p. 640.) An abuse of discretion occurs when the juvenile court exceeds the bounds of reason by making a determination that is arbitrary, capricious, or patently absurd. (See *In re N.M.* (2023) 88 Cal.App.5th 1090, 1094.)

Considering the relevant factors here, the juvenile court did not abuse its discretion by concluding any detriment to the children from losing their relationship with mother did not outweigh the benefits of adoption. The children were five years old when the court terminated parental rights. Over the course of those five years, the children spent less than a year in mother's

care.  In contrast, the children spent four years—the vast majority of their young lives—out of mother's home.

Although mother maintained consistent and regular visitation during that time, it is not apparent the children received any significant benefit from those visits.  Mother's visits typically lasted only a few hours per week, and many of them were monitored.  The caregivers reported the children generally enjoyed their time with mother, but they had no trouble saying goodbye at the end of visits.  Nor did the children frequently talk about mother when she was not around.  In fact, at one point, Mic.L. expressed not wanting to attend visits at all.  This strongly suggests any benefit the children received from the visits was minimal.

Mother also failed to show her relationship with the children provided significant benefits outside of visits.  The children experienced severe medical and behavioral issues, for which they likely would have benefited from additional parental support and care.  However, mother's involvement in those aspects of the children's lives was minimal.  According to the foster parent, mother often did not show up to the children's medical appointments.  Nor did mother seem to appreciate fully the seriousness of the children's medical needs, as evidenced by her delay in attending an EpiPen training and failure to ensure Mic.L. wore her glasses at all times.  On this record, the court reasonably could have determined mother is unlikely to provide the children meaningful support and care in the future.

In addition to the lack of significant benefits from the relationship with mother, the court reasonably could have found there was a risk that continuing the relationship would actually be detrimental to the children.  The Department reported that

mother did not consistently and timely respond to the children's aggressive behavior. According to a caregiver, mother's lack of rules resulted in the children struggling to readjust to their routines after returning home from visits. The caregiver specifically noted the children had more difficulty keeping their hands to themselves. This suggests visits were worsening the children's aggressive behavior, which already was an area of significant concern.

There also is evidence the visits were causing the children to suffer emotional harm. During one visit, the Department observed a " 'power struggle' " between mother and Mic.L. over whether the child recognized mother as an authority figure. During another visit, Mia.L. became upset when mother insisted the child not refer to the caregiver as " '[m]ommy.' " The court reasonably could have found mother's insistence that the children recognize her as their parent—despite not always fulfilling that role in their lives—would be confusing and ultimately detrimental to their emotional well being.

Mother contends the children would have benefited from continuing the relationship because they were bonded to her, showed her affection, considered her to be their parent, enjoyed spending time with her, and claimed they missed her. While all that may be true, a "showing the child derives some benefit from the relationship is not a sufficient ground to depart from the statutory preference for adoption." (*In re Breanna S.* (2017) 8 Cal.App.5th 636, 646, disapproved on another ground in *Caden C., supra,* 11 Cal.5th at pp. 637–638, fns. 6–7.) Rather, a parent has the burden to show the relationship "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new,

adoptive parents." (*Autumn H., supra*, 27 Cal.App.4th at p. 575.) Although the evidence mother points to would tend to support that finding, it does not compel it.

Mother also points to evidence that the children displayed aggressive behavior and difficulty transitioning between placements. She argues, because she was the only stable presence in the children's lives, they will suffer greatly from losing their relationship with her. While we agree with mother that the children struggled with the lack of stability in their lives, we do not agree that forgoing adoption is the answer. To the contrary, it would seem adoption is the option most likely to provide the children the security and stability they so desperately need. At the very least, we cannot say the juvenile court abused its discretion in finding the benefits of adoption outweigh any detriment from terminating the children's relationship with mother.

## DISPOSITION

We affirm the orders.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


EGERTON, J.

We concur:



LAVIN, Acting P. J.                    ADAMS, J.


15